# STATE OF MICHIGAN

# COURT OF APPEALS

BARBARA PACE,

        Plaintiff-Appellant,

v

JESSICA EDEL-HARRELSON, CHRISTY
LONG, and SIREN EATON SHELTER INC.,

        Defendants-Appellees.

FOR PUBLICATION
February 24, 2015
9:00 a.m.

No. 319223
Eaton Circuit Court
LC No. 12-000454-CZ

Before: SHAPIRO, P.J., and GLEICHER and RONAYNE KRAUSE, JJ.

SHAPIRO, J.

In this employment termination case, plaintiff Barbara Pace appeals by right the trial court order granting summary disposition in favor of defendants under MCR 2.116(C)(10) (no genuine issue of material fact) on plaintiff's two claims: (1) that her employment was terminated in violation of the Whistleblower's Protection Act (WPA), MCL 15.361 *et seq.*, and, alternatively, (2) that her discharge was against public policy. For the reasons discussed below, we reverse the trial court's grant on the WPA claim, but affirm on the claim of discharge against public policy.

## I. FACTS

Defendants in this action are: SIREN/Eaton Shelter (SIREN), an organization devoted to helping domestic violence victims and the homeless in Eaton County, Jessica Edel-Harrelson, SIREN's executive director, and Christy Long, a SIREN caseworker, i.e., plaintiff's former coworker. In January 2012, plaintiff was terminated from her position as a Domestic Violence Transitional Supportive Housing Coordinator/Advocate with SIREN. In this position, plaintiff was responsible for using state grant funds to assist domestic violence victims in finding permanent housing as well as providing other services. In affecting these goals, plaintiff was allowed to use grant funds to purchase housing items for SIREN clients. Plaintiff testified that when she purchased a housing item for a client using grant funds, she wrote the client's name on the back of the receipt and submitted the receipt to Long. Plaintiff stated that Long was in charge of tracking expenditures related to each grant.

Plaintiff testified that, in August 2011, she became concerned about what she viewed as discrepancies in grant funding records; she believed that grant money was being used to make unauthorized purchases. Plaintiff claimed that she discussed her concerns with Edel-Harrelson.

-1-

However, Edel-Harrelson testified that no such discussion ever took place. She did acknowledge that plaintiff asked her for "clarification" concerning alleged grant discrepancies.

Plaintiff testified that, on December 9, 2011, Long came to her and stated that she knew there was money remaining in a certain grant fund budget. Plaintiff stated that Long told her that Long's daughter needed a new stove but could not afford one. Plaintiff claimed that Long then told her she was going to use grant money to purchase the stove for her daughter; plaintiff felt that Long implied that plaintiff should document the transaction in attempt to cover-up the unauthorized purchase. At her deposition, Long denied ever using such funds for this purpose, or indeed ever discussing such a purchase with plaintiff.

Plaintiff testified that, following this conversation with Long, she immediately contacted Nancy Oliver, Edel-Harrelson's predecessor as the director of SIREN, to discuss the situation. Oliver suggested that plaintiff contact her supervisors, Carol Chandler and Martha Miller. According to plaintiff, she called Chandler and spoke with her for approximately 45 minutes, after which Chandler stated that she would report the matter to Miller and take care of the situation. Plaintiff stated that this procedure observed SIREN's "chain of command" for reporting such issues.

Plaintiff testified that she was unsatisfied with the lack of action and so, in late December 2011 or early January 2012, she reported her suspicions directly to Edel-Harrelson. She stated that, at that time, she believed that Long had already purchased the stove with grant funds. Plaintiff claimed that Edel-Harrelson told her that she would look into the matter and discuss it with Chandler and Miller. However, in her deposition, Edel-Harrelson claimed to have no recollection of such a discussion with plaintiff. Edel-Harrelson also testified that she had not been approached by Chandler or Miller regarding plaintiff's claim; indeed, she stated that she had no knowledge of such a conversation between plaintiff and Long. Edel-Harrelson did eventually investigate plaintiff's claim against Long and found no wrongdoing; however, that investigation occurred only after plaintiff filed her complaint in the instant action in April 2012.[1]

On January 18, 2012, plaintiff's employment with SIREN was terminated after ten years of what she characterizes as "loyal service and a spotless employment record." In this action, plaintiff alleges that her employment was illegally terminated for reporting Long's violation or planned violation of law to Edel-Harrelson. Plaintiff also claimed that her reporting resulted in harassment, which she termed as "snide comments" and "eye piercing dirty looks" from a former SIREN employee who had returned to volunteer, and Long being rude to her when she asked about vision insurance.

---

[1] There is conflicting evidence regarding whether Long ever purchased the stove in question. Plaintiff cited a receipt for a washer, dated May 21, 2012, that contained a notation stating "05/23/12 – Stove picked up." However, in a letter dated April 22, 2013 (after plaintiff filed the instant complaint), the president of the subject vendor asserted that the "stove" notation was a clerical error and should have referred to the washer described in the receipt; an updated receipt was provided with the correct notation. Plaintiff does assert that because SIREN had a line of credit with this vendor, it is possible that Long purchased the stove without leaving a paper trail.

SIREN's stated reason for terminating plaintiff's employment was plaintiff's own allegedly harassing and intimidating behavior toward a fellow employee. A letter addressed to plaintiff from Edel-Harrelson, dated January 22, 2012, states in relevant part:

> I regret to inform you that you are released from employment with SIREN/Eaton Shelter effective January 21, 2012.
>
> The reason for your termination is as follows: On Thursday, January 12, 2012, you engaged in behavior that resulted in fear and intimidation in co-workers, and which was witnessed by three employees. This behavior is in direct violation of SIREN/Eaton Shelter's policy Section 13.2, 13.2 Sub-section 6, and Section 13.3.
>
> As outlined in the agency policies, Section 13.2 states that conduct which may jeopardize personal safety, security or the welfare of the agency or its employees is prohibited. Any type of workplace violence or intimidation committed by employees will not be tolerated. Sub-section 6 states that employees shall refrain from aggressive or hostile behavior that frightens, distresses, or creates reasonable fear of injury to another person. Section 13.3 states that all employees are entitled to a work environment free from behavior that is disruptive or that interferes with employee ability to perform their duties.

Defendants presented evidence to support this reason for plaintiff's termination. On or about January 10, 2012, plaintiff, in the presence of witnesses, made an inappropriate comment to a co-worker. Plaintiff admitted making the comment as a joke. When Carol Hatch, a coworker who witnessed the comment, told plaintiff that the remark had been inappropriate, plaintiff asked if Hatch wished to go "toe to toe" with her.[2] The incident was reported to Miller, plaintiff's supervisor, who discussed the incident the next day with Edel-Harrelson. Edel-Harrelson testified that she originally advised Miller to proceed with a formal write-up, but upon further consideration, directed Miller to issue plaintiff a verbal warning.

According to Edel-Harrelson, Miller met with plaintiff on January 12, 2012 to deliver the verbal warning. Edel-Harrelson testified that plaintiff became angry and walked out of the meeting. After leaving the meeting, plaintiff apparently approached Hatch. Hatch averred that in the presence of two other case managers, Cheryl Tisdale and Elaine Schegitz, plaintiff "came into my office space . . . toward me with clenched fists, aggressively." Hatch stated that plaintiff "said to me, 'I hope you're happy, I just quit because of you.' She kicked the boxes inside the doors, twice, very hard, and I thought she was going to come toward me. I responded to her comment, 'No, I'm afraid.'" Hatch then took the rest of the day off, as well as the following day, "because I was feeling very shaken, threatened and vulnerable to attack by [plaintiff]'s rage toward me." Shegitz averred that plaintiff "stomped into the office, angry, with her hands

---

[2] Plaintiff characterized this statement not as an invitation to physical violence, but "to go toe to toe in regards to what [Hatch] wasn't doing and what she was doing in regards to the paperwork."

clenched" and "glared" at Hatch "and said something to [Hatch] along the lines of 'Thanks a lot . . . .'" However, Shegitz did not state that plaintiff kicked boxes or physically advanced on Hatch. Plaintiff categorically denied that she engaged in any physically intimidating behavior; indeed, she denied that she ever went into Hatch's work area after the meeting. After the meeting about the verbal warning, plaintiff acknowledged that she was "upset" and walked back to her office and "slammed her door." She denied that she threw or kicked anything.

After consulting with SIREN's Personnel Committee, Edel-Harrelson decided to terminate plaintiff's employment for the reasons cited in the January 22, 2012 letter. Plaintiff was informed of her firing in a meeting with Edel-Harrelson and Miller on January 18, 2012, and her employment was formally terminated on January 21, 2012.

On April 12, 2012, plaintiff brought the instant action, alleging two counts: that her termination was in violation of the WPA and constituted a retaliatory discharge in violation of public policy. On August 21, 2013, defendants moved for summary disposition, arguing that plaintiff could not establish a prima facie case under the WPA because (1) no conduct had occurred that could be considered a violation or suspected violation of law and, therefore, was not "protected activity" and (2) plaintiff could not establish a causal connection between her alleged report of a suspected violation of law and her termination. Defendants further argued that there was no applicable public policy basis to support plaintiff's claim of discharge against public policy.

On November 6, 2013, the trial court granted summary disposition in favor of defendants, ruling that plaintiff failed to establish that a violation or suspected violation of law occurred and that there was no public policy basis upon which to assert her claim of discharge against public policy.

## II. WHISTLEBLOWER'S PROTECTION ACT

Plaintiff argues that the trial court erred by granting defendants' motion for summary disposition on her WPA claim. We agree.[3]

---

[3] This Court reviews de novo a trial court's grant of summary disposition under MCR 2.116(C)(10). *Ernsting v Ave Maria College*, 274 Mich App 506, 509; 736 NW2d 574 (2007). "When deciding a motion for summary disposition under MCR 2.116(C)(10), a court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted in the light most favorable to the nonmoving party." *Id*. at 509-510. All reasonable inferences are to be drawn in favor of the nonmoving party. *Dextrom v Wexford Co*, 287 Mich App 406, 415; 789 NW2d 211 (2010). "Summary disposition is proper under MCR 2.116(C)(10) if the documentary evidence shows that there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Ernsting*, 274 Mich App at 509. "This Court is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008). "A genuine issue of material fact exists when the record, giving the benefit of any reasonable doubt to the opposing party, leaves open an issue

-4-

"The WPA provides a remedy for an employee who suffers retaliation for reporting or planning to report a suspected violation of a law, regulation, or rule to a public body." *Anzaldua v Neogen Corp*, 292 Mich App 626, 630; 808 NW2d 804 (2011). "The underlying purpose of the WPA is protection of the public. The statute meets this objective by protecting the whistleblowing employee and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law." *Id*. at 631 (quotation marks and citations omitted). Additionally, "[t]he WPA is a remedial state and must be liberally construed to favor the persons that the Legislature intended to benefit." *Id*.

MCL 15.362 provides:

> *An employer shall not discharge*, threaten, or otherwise discriminate against *an employee* regarding the employee's compensation, terms, conditions, location, or privileges of employment *because the employee*, or a person acting on behalf of the employee, *reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule* promulgated pursuant to law of this state, a political subdivision of this state, or the United States *to a public body*, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. [Emphasis added.]

"To establish a prima facie case under [MCL 15.362], a plaintiff must show that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." *Shaw v Ecorse*, 283 Mich App 1, 8; 770 NW2d 31 (2009), quoting *West v General Motors Corp*, 469 Mich 177, 183-184; 665 NW2d 468 (2003). In this case, it is undisputed that plaintiff was discharged from her employment, thus satisfying the second element.[4]

## A. PROTECTED ACTIVITY

In their motion for summary disposition, defendants argued, and the trial court agreed, that plaintiff had not engaged in protected activity because, at best, she reported a "possible future violation" of the law, not a "violation or suspected violation" of law and that, even taking plaintiff's deposition testimony as true, Long merely announced her intention to commit a violation of law in the future, which was insufficient to constitute either the crime of embezzlement or attempted embezzlement.

___

upon which reasonable minds could differ." *Ernsting*, 274 Mich App at 510. Questions of statutory interpretation are also reviewed de novo. *PNC Nat'l Bank Ass'n v Dep't of Treasury*, 285 Mich App 504, 505; 778 NW2d 282 (2009).

[4] Defendants conceded, at trial and on appeal, that SIREN is a "public body" for purposes of the WPA.

Contrary to the parties' contention, this case does not present an issue of first impression. In *Debano-Griffin v Lake Co*, 486 Mich 938, 938; 782 NW2d 502 (2010),[5] the Supreme Court reversed this Court's opinion holding that the plaintiff had not engaged in protected activity under the WPA. See *Debano-Griffin v Lake Co*, unpublished opinion per curiam of the Court of Appeals, issued October 15, 2009 (Docket No. 282921). In that case, the plaintiff's employment was terminated subsequent to her reporting of what she believed were unlawful transfers of county funds from an ambulance fund into a 911 fund. *Id*. at 1-2. This Court concluded that the plaintiff had not engaged in "protected activity," writing:

> Because plaintiff had only a subjective belief that defendants' activities or suspected activities violated unspecified "governing rules" (which may indeed have just been the suggestions of 911 directors she had been in contact with on how to make sure ambulance service was efficiently provided), and because she could not identify what law, rule, or regulation had been violated by the movement of funds from the ambulance account to another county account, she failed to establish the prima facie elements of a claim under the WPA. [*Id*. at 4.]

In lieu of granting the plaintiff's application for leave to appeal, the Supreme Court reversed, writing:

> The Court of Appeals erred in holding that the plaintiff was not engaged in protected activity under the Whistleblowers Protection Act (WPA), MCL 15.361 *et seq*. Reporting a "suspected violation of a law" is protected activity. MCL 15.362. MCL 211.24f(2)(d) requires the ballot to include "[a] clear statement of the purpose for the millage." In *City of South Haven v Van Buren Co Bd of Comm'rs*, 478 Mich 518, 533 n 23, 534[;734 NW2d 533] (2007), this Court, relying on this statutory language, held that "funds derived from levies must be used for the purpose stated in the ballot," and that using such funds for another purpose would "violate the law." See also, MCL 750.489; MCL 750.490; MCL 141.439. Accordingly, when the plaintiff reported her concerns that the ambulance funds were being used for purposes other than those stated in the ballot, the plaintiff was reporting a "suspected violation of a law," and, thus, was engaged in protected activity. Because the plaintiff reported a suspected violation of an *actual* law, it is unnecessary to address whether the reporting of a suspected violation of a *suspected* law constitutes protected activity. [*Debano-Griffin*, 486 Mich at 938 (emphasis in original).]

As in *Debano-Griffin*, this case does not involve a suspected violation of a *suspected* law. It concerns a suspected violation of an actual law. Defendants do not argue that if Long

---

[5] "An order of [the Michigan Supreme] Court is binding precedent if it constitutes a final disposition of an application and contains a concise statement of the applicable facts and reasons for the decision." *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 369; 817 NW2d 504 (2012). These requirements are satisfied in regard to the Supreme Court's order in *Debano-Griffin*, 486 Mich at 938.

purchased a stove for her daughter with grant funds (or taken sufficient steps to constitute an attempt of such a purchase), she would not have committed the crime of embezzlement (or attempted embezzlement). See MCL 750.174. This case then turns on whether plaintiff reported a "suspected violation of a law[.]" MCL 15.362. By protecting employees who report a "violation or a suspected violation" of a law, *id*., the Legislature did not intend that an employee must report an *actual* violation of law, see *Bush v Shabahang*, 454 Mich 156, 166-167; 772 NW2d 272 (2009) ("statute must be read as a whole" and "effect should be given to every phrase, clause, and word in the statute."). Had the Legislature so intended, it need not have included the phrase "suspected violation" at all.

In her deposition, plaintiff stated that at the time of her report, she believed Long had purchased the stove. Thus, defendants' argument that plaintiff only suspected that Long might do so in the future is inconsistent with the record. More broadly, we reject defendant's suggestion that, where an employee has a good faith and reasonable belief that a violation of the law has *either* already occurred *or* is being actively planned, the report of that belief is insufficient to trigger the protections of the WPA. Defendants' argument suggests that no matter how serious a violation is being planned, an employee who learns of the plan must (a) report the planned violation without the benefit of the protections the Legislature provided in the WPA; (b) remain silent until the violation occurs, or; (c) undertake her own investigation to determine whether and when the planned violation has been completed. The first two options are inconsistent with the language of the WPA and the third option would be foolish, if not dangerous and potentially unlawful. Requiring that a reporter wait until she is certain that the violation is complete is also inconsistent with the intent of the WPA, i.e., the *protection* of the public. *Anzaldua*, 292 Mich App at 631. The WPA affects this goal by protecting "employee efforts to report violations or suspected violations of the law." *Id*.

Defendants argue and offer testimony that the conversation between plaintiff and Long never occurred. However, the law requires that we view plaintiff's deposition testimony in the light most favorable to her for purposes of defendants' motion under MCR 2.116(C)(10). *Ernsting*, 274 Mich App at 509-510. Ultimately, a jury must make the factual determination of whether or not such a conversation occurred and, if so, what was said. However, the conversation between plaintiff and Long, *as plaintiff testified to in her deposition*, is sufficient to allow a jury to conclude that plaintiff reasonably suspected a violation of law, whether completed or actively planned. Thus, viewing the evidence in the light most favorably to plaintiff, she "reported a suspected violation of an *actual* law," which constitutes "protected activity" and is sufficient to establish the first element of a prima facie case under the WPA, *Debano-Griffin*, 486 Mich at 938. The trial court erred in ruling to the contrary.

B. CAUSAL CONNECTION

In their motion for summary disposition, defendants also argued that plaintiff could not establish the necessary causal connection between her alleged protected activity and her termination. Although the trial court did not rule on this issue, we are inclined to address it. See *Heydon v MediaOne*, 275 Mich App 267, 278; 739 NW2d 373 (2007) (holding that this Court may address an issue not ruled on by the trial court if it presents a question of law and all the facts necessary for its resolution have been presented). And we conclude that questions of fact

exist regarding causation sufficient to render summary disposition under MCR 2.116(C)(10) inappropriate under that alternative basis.

Establishing causation in a WPA claim requires the application of the burden-shifting analysis articulated in *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973). *Debano-Griffin v Lake Co*, 493 Mich 167, 175-176; 828 NW2d 634 (2013).

> Absent direct evidence of retaliation, a plaintiff must rely on indirect evidence of his or her employer's unlawful motivations to show that a causal link exists between the whistleblowing act and the employer's adverse employment action. A plaintiff may present a rebuttable prima facie case on the basis of proofs from which a factfinder could *infer* that the plaintiff was the victim of unlawful retaliation. Once a plaintiff establishes a prima facie case, a presumption of retaliation arises because an employer's adverse action is more likely than not based on the consideration of impermissible factors—for example, [a] plaintiff's protected activity under the WPA—if the employer cannot otherwise justify the adverse employment action.

> The employer, however, may be entitled to summary disposition if it offers a legitimate reason for its action and the plaintiff fails to show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a "motivating factor" for the employer's adverse action. A plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for unlawful retaliation. [*Id.* at 176 (quotation marks, citations, and formatting omitted).]

Plaintiff appears to concede that she has not advanced direct evidence of retaliation. As discussed, plaintiff asserts that she was terminated for reporting Long's violation or planned violation of law and defendants rebut that assertion by claiming that plaintiff was terminated for physically intimidating her coworkers. However, both of these factual assertions are far from established. Long claims that she never told plaintiff that she planned to buy her daughter a stove with grant funds, and Edel-Harrelson claims that plaintiff never reported to her such a conversation. By contrast, the allegation that plaintiff engaged in physically intimidating behavior is supported by Hatch's affidavit, but plaintiff claims that no such behavior toward Hatch occurred. Shegitz's affidavit, which defendants purport corroborates Hatch's account, is unpersuasive. Shegitz only averred that she witnessed plaintiff "glare" at Hatch and say something "along the lines of 'Thanks a lot,'" but could not "recall the rest." Put simply, both asserted reasons for plaintiff's termination are grounded in conflicting testimony and questions of witness credibility and the weight given to the evidence are reserved for the finder of fact. See, e.g., *People v Harrison*, 283 Mich App 374, 378; 768 NW2d 98 (2009).

These factual uncertainties must be resolved prior to conducting a meaningful burden-shifting analysis under *McDonnell Douglas*. Nonetheless, defendants argue that, even viewing the facts in the light most favorable to plaintiff, she cannot establish a causal connection between her alleged protected activity and her termination. Defendants assert that plaintiff has established no more than a temporal relationship between her claimed reporting of her conversation with Long and her termination and note that "[a] temporal relationship, standing

alone, does not demonstrate a causal connection between the protected activity and any adverse employment action." *West*, 469 Mich at 186-187. However, viewing the evidence in the light most favorable to plaintiff, her causation argument is not simply based upon a temporal relationship. She claims, and has testified, that the events for which defendant claims she was terminated never occurred. If the jury finds her credible and concludes that defendants' asserted reason for firing her was false, then it would obviously be proper for it to conclude that defendants' asserted basis for the firing was pretextual. Indeed, if the jury concludes that defendants invented an untrue incident as a basis to fire plaintiff, then it is difficult to see how they could conclude that it was *not* pretextual.

In sum, the issue of causation presents a genuine factual dispute and, therefore, the trial court improperly granted summary disposition in favor of defendants on plaintiff's WPA claim. See *Auto Club Ass'n v Sarate*, 236 Mich App 432, 437; 600 NW2d 695 (1999) ("The existence of [a] factual dispute means that summary disposition was improperly granted to defendant.").

### III. DISCHARGE AGAINST PUBLIC POLICY

Before the trial court and on appeal, plaintiff acknowledged that her claim of discharge against public policy was pled in the alternative to her WPA claim and that we need only address her public policy claim were we to affirm the trial court's grant of summary disposition in favor of defendants on her WPA claim. In other words, plaintiff concedes that her public policy claim need only be allowed to proceed if she failed to establish a prima facie case under the WPA. This position is consistent with the applicable law. See *Anzaldua*, 292 Mich App at 631 (citations omitted) ("The WPA provides the exclusive remedy for such retaliatory discharge and consequently preempts common-law public-policy claims arising from the same activity. However, if the WPA does not apply, it provides no remedy and there is no preemption."). Accordingly, we affirm the trial court's grant of summary disposition in favor of defendants on plaintiff's public policy claim and need not address the merits of that decision. See *Taylor v Laban*, 241 Mich App 449, 458; 616 NW2d 229 (2000) (this Court need not reverse a trial court's ruling when it reached the right result, even if for the wrong reason).

We reverse the trial court's grant of summary disposition in favor of defendants on plaintiff's WPA claim and remand for proceedings consistent with this opinion. We affirm the trial court's grant of summary disposition in favor of defendants on plaintiff's claim of discharge against public policy. We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause